66 F.3d 325
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Robert GREGORY, Plaintiff-Appellant,
v.
INTERFACE FLOORING SYSTEMS, INC., Defendant-Appellee.
 No. 93-4261.
 United States Court of Appeals, Sixth Circuit.
 Sept. 8, 1995.
 
 BEFORE: KENNEDY and DAUGHTREY, Circuit Judges, and CLELAND, District Judge.*
 PER CURIAM.
 
 
 1
 In this diversity action, the plaintiff-appellant, Robert Gregory, appeals from the decision of the district court granting summary judgment to the defendant, Interface Flooring Systems, Inc., on Gregory's claims of age discrimination in employment, breach of contract, promissory estoppel, and breach of public policy. Before this court, he contends that there are genuine issues of material fact concerning each of his claims for wrongful discharge against his former employer, sufficient to justify denial of a motion for summary judgment. For the reasons set out below, we conclude that the judgment of the district court should be affirmed in part, reversed in part, and remanded for further proceedings on the breach of contract claim only.
 
 I. FACTUAL AND PROCEDURAL BACKGROUND
 
 2
 From 1982 until February 1991, Gregory, an Ohio resident, worked as a salesman for Interface Flooring, a Georgia corporation, in the Great Lakes region. By contract, Gregory and other sales personnel were considered at-will employees who could resign or be terminated with 30-days' notice. Furthermore, the contracts of the sales staff provided that those individuals would receive monthly "draws" from the company against which earned commissions from sales would be applied.
 
 
 3
 As part of his job, Gregory was assigned carpet sales quotas that he considered only targets and not minimum requirements for continued employment. While Gregory failed to meet his sales quota in 1983, figures from the company established that the plaintiff's sales in 1984 were 163% of his original quota. From 1985 through 1990, however, Gregory never met his sales quota and, in fact, was consistently one of the salespersons attaining the lowest percentage of the assigned quota. Despite not meeting "targeted" goals, Gregory nevertheless received plaques in 1986 and 1987 for his sales work in the region to which he was assigned. Furthermore, in 1989, Gregory received two brief letters of recognition from Interface Flooring's president commending him for his job performance.
 
 
 4
 By February 1990, Gregory's supervisor, Bob McDonald, was "reassigned" within the company while battling cancer and William Sinzheimer assumed the day-to-day responsibilities of the zone manager. Although Gregory's previous contacts with Sinzheimer had always been "cordial," the new zone manager informed the plaintiff that he expected more from the sales staff. He specifically questioned why the plaintiff's sales figures for 1985-1989 were so low and told Gregory that he would be expected to meet his sales quotas in the future. Sinzheimer also prepared monthly reports reviewing the sales activity of the sales staff and communicated to Gregory the deficiencies in his work and the necessity of rectifying his lagging sales. In the monthly reports for August through November, 1990, Sinzheimer noted, variously but consistently, that Gregory's sales activities were "well below an acceptable level," were "much too low," were "a little low" considering the area for which Gregory was responsible, and weren't "very good." Sinzheimer warned the plaintiff that he was "concerned with the corporate business," that he expected Gregory to follow directions and file reports in a timely manner, and that Gregory should work hard to improve his results before the end of the year. "Failure to do so," Sinzheimer wrote in May 1990, "could result in disciplinary action up to and including termination. Let this be a warning." The plaintiff admitted that he understood the comments in the reports to be criticism of his job performance.
 
 
 5
 Concerned about his increasingly precarious position with the company, Gregory visited Bob McDonald in the late fall of 1990 and expressed apprehension that he might be fired, citing Sinzheimer's displeasure with his sales performance. According to Gregory, McDonald told him, "[D]on't worry about it, that they know it takes about nine months like when you get started, that it takes about nine months for you to get your area going again." (McDonald died in 1991 and was, himself, never deposed.)
 
 
 6
 Apparently, the "final straw" came in December 1990, when Gregory, as part of a recognized and encouraged sales tactic, set up a "mill visit" at Interface Flooring's Georgia mill with representatives of a prospective customer. According to Richard Stein, the senior vice-president of sales who observed Gregory during the tour, the plaintiff "conducted one of the worst organized mill visits he had ever seen. Among other things, Gregory was unprepared and did not focus on the important issues." Gregory maintains, however, that the mill visit was unsuccessful not because of his alleged lack of preparedness or because of alleged ineffectiveness, but because one of the prospective customers observed defective carpet at the facility that was prepared for shipment to another buyer and became concerned about Interface Flooring's quality control procedures.
 
 
 7
 A review of the 1990 year end sales figures showed that Gregory again failed to meet his sales quota, selling only 60% of the carpet that he had been asked to sell for the year. Moreover, internal company memoranda reported that many of the plaintiff's customers did not like Gregory and refused to deal with Interface Flooring as a result of their contacts with the plaintiff. Finally, on February 6, 1991, Sinzheimer met with Gregory and fired him as a result of "his failure to meet his quota and other performance shortcomings despite repeated warnings and offers of help in improving, and ... his poor performance during the ... mill visit." The company claimed, through Sinzheimer, that at the time of his termination, Gregory had received $5,500.00 more in draws in 1991 than he had earned in commissions. Sinzheimer also asserted that he was unaware of the plaintiff's age at the time Gregory was terminated.
 
 
 8
 Gregory then filed for unemployment benefits with the Ohio Bureau of Employment Services. After examining the plaintiff's claim, the Bureau awarded benefits to Gregory, based on its determination that the claimant had been discharged without just cause.
 
 
 9
 The plaintiff also filed suit against Interface Flooring, claiming that he was 41 years old when fired and that the company terminated him because of his age and replaced him with a 27-year-old employee. In support of his claim, Gregory offered evidence that his sales quota for 1990 was higher than that of a younger employee assigned to the same area, and that Sinzheimer had once referred to another employee as an "old four-ply guy," and had referred to a 27-year-old employee as a "young buck." He also offered a copy of an affidavit of Frank J. Cappezio, Jr., a former employee, who heard a regional vice-president of Interface Flooring claim "on more than one occasion that the company was looking for younger people to work in Pittsburgh." Nevertheless, Gregory himself also admitted that no comments about his age were ever made to him by company personnel.
 
 
 10
 The plaintiff further insisted, contrary to Interface Flooring's position, that his earned commissions far exceeded the salary draws he had received in 1991. Consequently, argued Gregory, he was entitled, under the terms of his employment contract, to additional compensation from the defendant upon his termination.
 
 
 11
 In addition to the age discrimination and breach of contract claims, Gregory also alleged in his complaint that Bob McDonald's advice not to worry about the possibility of being fired for failing to meet sales quotas amounted to a promise of continued employment upon which he relied to his detriment. Moreover, the plaintiff contended that his discharge from Interface Flooring contravened the state's public policy, as expressed in its employment discrimination statute, and that the public policy violation itself provided yet another basis for job reinstatement and recovery of monetary damages.
 
 
 12
 Interface Flooring filed a motion for summary judgment on each of the claims raised by the plaintiff. The district court, finding no genuine issue of material fact concerning any of the four causes of action, granted that motion and dismissed the complaint in its entirety.
 
 II. ANALYSIS
 
 13
 This court reviews the grant of a motion for summary judgment de novo. American Cas. Co. v. F.D.I.C., 39 F.3d 633, 636 (6th Cir.1994). Under the provisions of Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, 477 U.S. 242, 247-48 (1986); American Cas. Co. v. F.D.I.C., 39 F.3d at 636.
 
 A. Age Discrimination Claim
 
 14
 Gregory first insists that Interface Flooring's termination of him and its subsequent hiring of a 27-year-old replacement violated the dictates of the Ohio age discrimination statute. Pursuant to the provisions of Ohio Revised Code Sec. 4101.17(A):
 
 
 15
 No employer shall discriminate in any job opening against any applicant or discharge without just cause any employee aged forty or older who is physically able to perform the duties and otherwise meets the established requirements of the job and laws pertaining to the relationship between employer and employee.
 
 
 16
 In interpreting that statute, the Ohio appellate courts have concluded that a plaintiff seeking to recover for age discrimination in employment must first establish "(1) that he was a member of the statutorily protected class, (2) that he was discharged, (3) that he was qualified for the position, and (4) that he was replaced by, or his discharge permitted the retention of, a person who did not belong to the protected class." Barker v. Scovill, Inc., 6 Ohio St.3d 146, 148, 451 N.E.2d 807, 809 (1983). Once that prima facie showing has been made, the defendant must "provide a legitimate, nondiscriminatory reason for plaintiff's discharge." Id. Finally, the burden of production then returns to the plaintiff to "prove by a preponderance of the evidence that the reasons which defendant articulated for the firing were merely a pretext for unlawful discrimination." Id., citing Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248 (1981); McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).
 
 
 17
 In this matter, there is no dispute that the 41-year-old plaintiff is a member of the statutorily-protected class, that he was discharged, and that he was replaced by someone not in the protected class. Hence, the dispositive issue with regard to the claim of age discrimination is whether Gregory was qualified for the sales position from which he was discharged.
 
 
 18
 In order to establish such qualifications, the plaintiff may simply show "that he or she was doing the job well enough to meet his employer's legitimate expectations." Danielson v. City of Lorain, 938 F.2d 681, 683 (6th Cir.1991). See also Chappell v. GTE Products Corp., 803 F.2d 261, 266 (6th Cir.1986), cert. denied, 480 U.S. 919 (1987). Gregory has not, however, raised in this case a genuine issue of material fact regarding his attainment of Interface Flooring's present, legitimate employment performance standards. Gregory claims that, despite failing to reach sales quotas in previous years, he received commendations from his employer so as to suggest that he was, at least in the past, meeting legitimate expectations. Other evidence indicated, however, that even in the face of repeated warnings and requests to increase the amount of his sales, the plaintiff continued to languish at sales percentages well below his established quota. Furthermore, evidence was adduced to establish that an important mill tour organized by Gregory was poorly conducted and may have cost the company a lucrative contract with a large buyer. Gregory's claim that the mill tour was unsuccessful because one of the visitors saw defective carpeting does not negate the fact that his own performance was perceived as substandard. Additionally, internal memoranda suggested that part of Gregory's problem in meeting his quotas was engendered by the dislike and dissatisfaction of his customers with him and his sales style.
 
 
 19
 We conclude, as a matter of law, that Gregory did not establish a prima facie case of age discrimination. Moreover, we are satisfied that Interface Flooring advanced a legitimate, nondiscriminatory reason for discharging the plaintiff, specifically, Gregory's continued failure to meet sales quotas and his poor performance at the mill tour with an important customer. We therefore conclude that the district court ruled appropriately that the plaintiff's "unsatisfactory work performance" justified termination of the employee.
 
 
 20
 Nor can we conclude that the company's explanation for Gregory's discharge was pretextual, as Gregory charges. The record suggests strongly, and without contradiction, that although Gregory was able to meet the somewhat lax standards of his original supervisor, Bob McDonald, he could not satisfy the more stringent performance standards set by Bill Sinzheimer, who became his zone manager in February 1990, one year before his discharge. Sinzheimer's dissatisfaction was registered early and often, beginning by at least May 1990, when Gregory was told in no uncertain terms that he was risking discharge if his employment record did not improve by the end of the year.
 
 
 21
 Moreover, there is ample proof that Gregory had received the message Sinzheimer was sending. In a deposition, Gregory conceded that he knew "it was going to be different under Sinzheimer. There were statements made to the likes of that, you know, he was going to expect more from us...."
 
 
 22
 In view of this evidence, we conclude that Gregory's reliance on the receipt of standard company commendations prior to February 1990, and on isolated references by Sinzheimer and others to various employees as "an old four-ply guy" and "a young buck" are simply insufficient as a matter of law to establish pretext. See generally Gagne v. Northwestern Nat'l Ins. Co., 881 F.2d 309, 314 (6th Cir.1989). Gregory argues that he was not the only Interface Flooring salesperson with a below-quota sales record. The record suggests, however, that he was also not the only sales employee fired after Sinzheimer took over the zone as manager.
 
 
 23
 The plaintiff also insists that Interface Flooring's discriminatory intent can be shown by the fact that a younger salesman was given a much lower quota than Gregory to work in the same area as the plaintiff. There is no dispute evident in the record, however, that the lower quota was established months prior to hiring anyone. Furthermore, the justification advanced for the quota differential was the reasonable explanation that the new hire would not begin working until the third or fourth quarter of the year and "that it usually takes a new sales representative 3-6 months to learn Interface Flooring's business and to learn the specific territory assigned." The examples of allegedly improper motive on the part of the defendant company do not, therefore, raise a genuine issue of material fact sufficient to counter Interface Flooring's summary judgment motion.
 
 
 24
 Gregory further alleges that Interface Flooring's improper motive in discharging him is established by the fact that the Ohio Bureau of Employment Services awarded him unemployment benefits after determining that he had been discharged without just cause. The plaintiff argues that this court must accord preclusive effect to that administrative determination, thus foreclosing the possibility that the defendant could establish as a matter of law that its termination of the plaintiff was proper. Gregory's premise in this argument is erroneous, however. Contrary to his understanding, not all state administrative decisions are to be accorded preclusive effect in subsequent federal proceedings. Instead, it is only "when a state agency 'acting in a judicial capacity ... resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate,' ... [that] federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." Univ. of Tenn. v. Elliott, 478 U.S. 788, 799 (1986) (citation omitted) (emphasis added). In this case, there is absolutely no indication that the Ohio Bureau of Employment Services was acting in a judicial capacity when ruling on Gregory's claim for benefits.
 
 
 25
 Furthermore, Ohio Revised Code Sec. 4141.28(S), concerning unemployment compensation benefits, clearly states:
 
 
 26
 No finding of fact or law, decision, or order of the administrator, referee, or the board of review, or a reviewing court pursuant to this section, shall be given collateral estoppel or res judicata effect in any separate or subsequent judicial, administrative, or arbitration proceeding, other than a proceeding arising under this chapter.
 
 
 27
 Because Gregory's age discrimination claim arose under chapter 4101 of the code, not chapter 4141, Ohio law specifically divests the prior unemployment compensation decision of any preclusive effect in this federal court proceeding.
 
 
 28
 We conclude that the plaintiff has failed to show that the district court erred in granting summary judgment on his age discrimination claim.
 
 B. Breach of Contract Claim
 
 29
 Gregory also raises a breach of contract claim in his complaint, asserting that Interface Flooring owed him more money in commissions for 1991 than the plaintiff received in draws from the company for that period. Pursuant to the company's "Statement of Terms, Policies and Procedures," draws were paid to sales employees at the end of each month. Each quarter, a reconciliation between the drawn amount and the amount of sales commissions earned by the employee was then undertaken. If the amount of the draw exceeded the commissions earned, the company could have deducted the overpayment from the next month's draw, reduced future commissions by the amount of the overdraw, or demanded immediate repayment of the overdrawn amount.
 
 
 30
 Claiming that he was owed $15,000 in unpaid commissions, the plaintiff asserted that the company was dilatory in reimbursing him that amount. The district court, however, granted summary judgment to the defendant on this cause of action after noting William Sinzheimer's statement that Gregory had actually received $5,500 more in draw than he earned in commissions during the final months of the plaintiff's employment with the company.
 
 
 31
 In order to defeat Interface Flooring's summary judgment motion, Gregory did introduce evidence raising a genuine issue of material fact regarding the amount of commission or reimbursement due. Rather than rely solely upon allegations in the complaint, the plaintiff introduced a letter from the "vice-president-general counsel" of Interface Flooring to Gregory's attorney. In that correspondence, the company states its belief that Gregory would be due "between $1,000 and $2,000" after applying all offsets to earned commissions for 1991. That evidence alone is sufficient to raise a legitimate factual dispute regarding the amount of compensation due the plaintiff. Such a legitimate factual dispute, in turn, should have been sufficient to defeat a motion for summary judgment on this cause of action.
 
 
 32
 Interface Flooring argues, however, that the letter noting the amount due to the plaintiff is inadmissible as a settlement offer. See Fed.R.Evid. 408. Without question, portions of the correspondence do suggest terms that, if accepted, would have settled the dispute between the parties without the need to resort to litigation. Nevertheless, the pertinent portion of the document is clearly not related to any settlement offer and, in fact, states, "If Mr. Gregory is unwilling to accept this [settlement] offer, we will pay him the commissions accrued on shipments for sales he made through the date of termination of his employment, less any applicable withholding amounts or appropriate off-sets. We believe this amount will be between $1,000 and $2,000." (Emphasis added.) Thus, the information highlighting the genuine issue of material fact on this cause of action is not barred from admission by Fed.R.Evid. 408.
 
 
 33
 Alternatively, Interface Flooring insists that no legitimate dispute exists in this regard because Gregory failed to abide by the requirement in the company's policy that the employee, within five days of termination, provide a list of commissions earned. Also, Interface Flooring contends that Gregory is not entitled to commission reimbursement because the plaintiff, upon termination, rejected a company offer of transition payments that would have covered any commissions due. We find these arguments also unavailing.
 
 
 34
 First, we note that the relevant portion of the policy requiring timely written listing of outstanding commissions applies only to sales persons "terminated by Interface Flooring without cause." The company specifically denies that Gregory was discharged without cause. Thus, it appears that Interface Flooring may not rely on that provision of the policy to defeat the plaintiff's breach of contract claim.
 
 
 35
 Second, we conclude that Gregory's rejection of the offer of transition payments did not waive his breach of contract claim, contrary to the defendant's contention. Acceptance of the transition payment offer would have necessitated an agreement by Gregory to release Interface Flooring and its officers, directors, and employees from all claims resulting from his employment with the company, including his age discrimination claim. Because the plaintiff's decision to forego the transition payments was motivated in part by his desire to retain other causes of action that he might have had against the defendant, we conclude that Gregory did not waive his breach of contract claim by that rejection of Interface Flooring's offer.
 
 C. Promissory Estoppel Claim
 
 36
 Gregory next insists that the statement made to him by Bob McDonald that he should not worry about being fired for failing to meet quota requirements constitutes a promise of continued employment upon which the plaintiff detrimentally relied. The Ohio courts have determined, however, that a promise must be "clear and unambiguous" in order to support a claim of promissory estoppel. Cohen & Co. v. Messina, 24 Ohio App.3d 22, 26, 492 N.E.2d 867, 872 (1985); Kasuri v. St. Elizabeth Hosp. Medical Center, 897 F.2d 845, 852-53 (6th Cir.1990). McDonald's statement simply cannot be interpreted to be a "clear and unambiguous" promise of continued employment. As a matter of law, therefore, Gregory failed to establish an important element of a promissory estoppel claim. It follows that the district court did not err in entering summary judgment for the defendant on this cause of action.
 
 D. Breach of Public Policy Claim
 
 37
 Finally, Gregory cites the Ohio Supreme Court decision in Greeley v. Miami Valley Maintenance Contractors, Inc., 49 Ohio St.3d 228, 551 N.E.2d 981 (1990), for the proposition that violation of a statutory duty by a civil defendant will support a claim for breach of public policy, regardless of other remedies available to the injured party. In Greeley, the plaintiff was allowed to pursue a "breach of public policy" cause of action when violation of a statute by the defendant in that case did not accord the plaintiff a private right of action. Instead, the applicable statute merely called for assessment of a civil fine against the employer. In this case, however, Gregory is provided a specific personal cause of action by statute. Consequently, there is no need to imply a "breach of public policy" claim in order to vindicate Gregory for the alleged statutory violations by his employer. See, e.g., Pozzobon v. Parts for Plastics, Inc., 770 F.Supp. 376, 380 (N.D.Ohio 1991). The district court also did not err in granting summary judgment to the defendant on this cause of action.
 
 III. CONCLUSION
 
 38
 For the reasons stated above, we conclude that the district court did not err in granting summary judgment to the defendant on Gregory's claims of age discrimination, promissory estoppel, and breach of public policy. Because, however, Gregory did raise a genuine issue of material fact regarding his breach of contract claim, we hold that the grant of summary judgment to the defendant on that cause of action was error. We therefore AFFIRM the district court's judgment in part, REVERSE in part, and REMAND the case for further proceedings on the plaintiff's claim for breach of contract.
 
 
 
 *
 The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation